IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF TENNESSEE ex rel. GARY ODOM and ROSS LUMPKIN, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Case No. 3:17-cv-689 Chief Judge Waverly D. Crenshaw, Jr. |
| v. | ) ) | |
| SOUTHEAST EYE SPECIALISTS, PLLC, SOUTHEAST EYE SURGERY CENTER, LLC, and EYE SURGERY CENTER OF CHATTANOOGA, LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF OBJECTIONS
TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
ON MOTIONS TO INTERVENE**

BASS, BERRY & SIMS PLC
Matthew M. Curley
Molly K. Ruberg
Scott D. Gallisdorfer
150 Third Avenue South, Suite 2800
Nashville, TN 37201
mcurley@bassberry.com
mruberg@bassberry.com
scott.gallisdorfer@bassberry.com

BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
Alan E. Schabes (*admitted PHV*)
200 Public Square
Suite 2300
Cleveland, Ohio 44114-2378
aschabes@beneschlaw.com

BENESCH, FRIEDLANDER,
COPLAN & ARONOFF LLP
Juan Morado, Jr. (*admitted PHV*)
71 South Wacker Drive
Chicago, Illinois 60606-4637
jmorado@beneschlaw.com

*Attorneys for Defendants SouthEast Eye Specialists, PLLC,
SouthEast Eye Surgery Center, LLC, and Eye Surgery Center of Chattanooga, LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

OBJECTIONS TO THE REPORT AND RECOMMENDATION .................................................. 2

BACKGROUND ........................................................................................................ 3

STANDARD OF REVIEW .......................................................................................... 7

ARGUMENT ........................................................................................................... 7

I.     The United States Has Not Identified "New Evidence" to Support Its Untimely Request
       to Intervene. ................................................................................................. 8

II.    Relators' Consent to Intervention Does Not Establish Good Cause................................ 12

III.   The Government's Untimely Intervention Would Prejudice Defendants and Undermine
       Congressional Intent. ...................................................................................... 13

IV.    Tennessee Has Not Established Good Cause to Intervene. ....................................... 17

CONCLUSION ........................................................................................................ 19

## TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*Guthrie on behalf of United States v. A Plus Home Health Care, Inc.*,
2013 WL 12384137 (S.D. Fla. Jul. 8, 2013)............................................................11

*Nix v. Sword*,
11 F. App'x 498 (6th Cir. 2001) ...........................................................................10

*Rymer v. Lemaster*,
2017 WL 4411790 (M.D. Tenn. Oct. 4, 2017) ........................................................7

*Sharpe ex rel. U.S. v. Americare Ambulance*,
2017 WL 2986258 (M.D. Fla. Jul. 13, 2017) ........................................................12

*U.S. ex rel. Brasher v. Pentec Health, Inc.*,
338 F. Supp. 3d 396 (E.D. Pa. 2018) ....................................................................14

*U.S. ex rel. Costa v. Baker & Taylor, Inc.*,
955 F. Supp. 1188 (S.D. Cal. 1997)................................................................15, 16

*U.S. ex rel. Drennen v. Fresenius Med. Care Holdings, Inc.*,
2017 WL 1217118 (D. Mass. Mar. 31, 2017).......................................................12

*U.S. ex rel. Hall v. Schwartzman*,
887 F. Supp. 60 (E.D.N.Y. 1995) ..................................................................7, 8, 10

*U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*,
912 F. Supp. 2d 618 (E.D. Tenn. 2012)..........................................................9, 15, 16

*U.S. ex rel. Roberts v. Sunrise Senior Living Inc.*,
2009 WL 499764 (D. Ariz. Feb. 26, 2009)...............................................................8

*U.S. ex rel. Stone v. Rockwell Int'l Grp.*,
950 F. Supp. 1046 (D. Colo. 1996)..........................................................10, 11, 12

**Statutes**

31 U.S.C. § 3730(b) .........................................................................4, 8, 11, 14

31 U.S.C. § 3730(c) ...........................................................................................7

Tenn. Code Ann. § 4-18-104(f) .....................................................................7, 17

Tenn. Code Ann. § 71-5-183(c)......................................................................7, 17

ii

**Other Authorities**

Fed. R. Civ. P. 72(b) ...................................................................................................1, 7

Local Rule 72.02 ...........................................................................................................1

S. Rep. No. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266..............................8, 10, 11, 15

Case 3:17-cv-00689   Document 86   Filed 08/14/20   Page 4 of 24 PageID #: 430

Pursuant to Federal Rule of Civil Procedure 72(b) and Local Rule 72.02, Defendants SouthEast Eye Specialists, PLLC, SouthEast Eye Surgery Center, LLC, and Eye Surgery Center of Chattanooga, LLC (collectively, "Defendants") respectfully submit this memorandum in support of their objections to the Magistrate Judge's Report and Recommendation (Dkt. No. 84) on the United States' and the state of Tennessee's motions to intervene (Dkt. Nos. 65, 72).

## PRELIMINARY STATEMENT

In this False Claims Act ("FCA") action, the United States and the state of Tennessee have sought to intervene and take control of the litigation nearly *three years* after Relators originally filed their complaint, and more than *six months* after the Court set a final deadline for intervention. Even though the Court already granted six separate extensions of that deadline, the United States and Tennessee contend that they needed still *more* time to "complete" their investigations and have now determined that intervention is warranted. Yet, despite having more than *two years* to conduct unchecked, one-sided discovery, neither the United States nor Tennessee has pointed to any new facts that their ongoing investigations have uncovered. Nor have they otherwise identified anything about this case that has meaningfully changed since they originally declined to intervene more than a year ago.

The FCA requires that the government establish "good cause" for intervening after it originally declines to do so. If that standard is to have any meaning whatsoever, then it must be concluded that neither the United States nor Tennessee has made that showing here. Such a conclusion does not leave the United States and Tennessee without recourse. If the United States and Tennessee believe Relators are incapable of effectively pursuing fraud claims on their behalf, they may file a new, separate action against Defendants to pursue those claims themselves. What they *cannot* do, however, is intervene in this existing FCA action long after

1

the Court's deadline without any good cause. The plain terms of the statute simply do not allow for that.

Permitting intervention at this stage of the proceeding would also significantly prejudice Defendants. Defendants have already endured years of burdensome government investigation at substantial effort and expense, and permitting even more delay would only further deplete Defendants' limited resources, all before they are provided any reciprocal discovery or even a meaningful chance to challenge the allegations against them. Denying leave to intervene is all the more appropriate given how the United States has exploited the FCA's procedural framework. Rather than use the seal period for its intended purpose—to efficiently evaluate the grounds for potential intervention—the United States has instead used that period to conduct one-sided discovery and to obtain an unfair litigation advantage over Defendants. Because Defendants have already moved to dismiss Relators' complaint, permitting intervention now would only bolster that unfair advantage by effectively granting the United States a preview of Defendants' arguments for dismissal.

Despite these facts, the Magistrate Judge recommended that the Court grant both motions to intervene. As explained in more detail below, the Magistrate Judge incorrectly concluded the United States has identified new evidence, placed undue weight on Relators' consent to belated intervention, and failed to fully analyze the potential prejudice to Defendants. The Magistrate Judge also failed to evaluate whether Tennessee has independently established good cause. For these reasons, the Court should decline to adopt the Report and Recommendation and deny both motions.

## OBJECTIONS TO THE REPORT AND RECOMMENDATION

The Magistrate Judge's Report and Recommendation (Dkt. No. 84) was wrongly decided and should not be adopted for the following reasons:

1. <u>The Magistrate Judge incorrectly concluded that the United States has identified "new evidence" to support its belated request to intervene</u>. The Magistrate Judge determined that good cause exists to support the United States' belated request to intervene in part because it supposedly discovered "new evidence" that warrants intervention. In fact, however, the United States has pointed only to new *investigation.* Because the United States and Tennessee have failed to identify specific "new and significant" evidence that any additional investigation has revealed, they have not established good cause to intervene.

2. <u>In analyzing whether "good cause" for untimely intervention exists, the Magistrate Judge placed undue weight on Relators' consent</u>. The Magistrate Judge determined that Relators' consent to the two governments' belated motions to intervene weighs heavily in favor of granting the motions. But, as several courts have concluded, the "good cause" requirement was intended to protect FCA *defendants* as well as relators. Without *Defendants'* consent—or any other good cause to support belated intervention—Relators' consent does not suffice.

3. <u>The Magistrate Judge failed to adequately account for the prejudice to Defendants</u>. The Magistrate Judge acknowledged that permitting the governments to intervene at this stage would cause some prejudice to Defendants, but recommended permitting intervention anyway. Noting that only six months had elapsed between the Court's intervention deadline and the governments' motions to intervene, the Magistrate Judge ignored the fact that the government had already received six extensions of the intervention deadline, allowing them to conduct *years* of burdensome, one-sided discovery. The Magistrate Judge also largely ignored the United States' abuse of the FCA's procedural scheme, failing to recognize that permitting intervention in these circumstances would undermine congressional intent.

4. <u>The Magistrate Judge did not independently analyze whether Tennessee has established good cause to intervene</u>. Rather than identify any independent good cause for allowing it to intervene after the Court's deadline, Tennessee has moved to intervene for "the same reasons" cited by the United States. But, Tennessee is a separate entity with independent investigative obligations under separate state statutes. Neglecting to recognize this distinction, the Magistrate Judge recommended allowing Tennessee to intervene even though it has made no independent showing of good cause whatsoever.

In sum, the United States and Tennessee have failed to establish good cause for permitting them to intervene long after the Court's intervention deadline. Their motions to intervene should be denied.

## **<u>BACKGROUND</u>**

Relators Gary Odom and Ross Lumpkin filed this FCA *qui tam* action on behalf of the United States and the state of Tennessee more than three years ago. (*See* Dkt. No. 1.) Relators'

3

complaint primarily alleges that Defendants—an ophthalmology practice and affiliated surgery centers—violated the federal and Tennessee False Claims Acts by engaging in routine "co-management" of cataract surgery patients. Co-management is a collaborative approach to patient care through which the ophthalmologist who performs the cataract surgery splits the applicable Medicare or Medicaid global surgery fee with an optometrist who provides the patient's post-surgical care. Co-management is expressly authorized by the Centers for Medicare and Medicaid Services ("CMS"), which has designated specific billing codes to facilitate payment to each provider in proportion to the care they provide. Yet, despite CMS's approval, Relators allege that Defendants' co-management of cataract surgery patients violates the criminal Anti-Kickback Statute ("AKS"), purportedly because Defendants' "routine" use of co-management somehow transforms the CMS-authorized fee paid to a co-managing optometrist into an illegal kickback in exchange for referrals. On that novel theory, Relators allege that Defendants submitted false claims for payment to government healthcare programs. Relators also allege that Defendants violated the AKS by providing free medical education courses (which included free food and drink) to the optometric community.

Relators initially filed their complaint under seal (as the statutes require), and the United States and Tennessee began investigating the allegations soon after. Ordinarily, the government has sixty days to complete its investigation, after which the complaint is unsealed and the government must elect whether to intervene. *See* 31 U.S.C. § 3730(b). Here, however, as in many FCA actions, the United States and Tennessee did not complete their investigations within that 60-day period. Instead, they sought and obtained from the Court several extensions of the seal period and intervention deadline, which may be granted only upon a showing of "good cause." *Id.* § 3730(b)(3). All told, the two governments received *six* separate extensions of the seal period and deadline, spanning more than two years from the filing of Relators' complaint.

4

They obtained these extensions on an *ex parte* basis, and their supporting submissions remain under seal. Thus, although the sixth and final extension was to expire on August 9, 2019, Defendants were unaware of that deadline until the complaint was unsealed.

Meanwhile, on December 1, 2017, the United States served a wide-ranging Civil Investigative Demand ("CID") on Defendants, seeking documents and information about nearly every aspect of Defendants' business and operations. Defendants fully cooperated with the investigation, making thirteen separate document productions and answering an extensive set of written interrogatories. Defendants completed their productions of over 26,000 documents on May 8, 2019, but had produced the vast majority of those documents by December 2018. Defendants also made available three witnesses for CID depositions. The last of these depositions took place on August 6, 2019, just three days before the intervention deadline. Immediately following that final deposition, counsel for the United States presented the government's "key factual findings" to Defendants' counsel and expressed the government's position that Defendants' conduct amounted to violations of the FCA.

Nevertheless, upon expiration of the seal period three days later, the United States and Tennessee filed a joint notice stating that they were "not intervening at this time." (Dkt. No. 41.) The notice asserted that they *still* had not completed their investigations and thus were "not able to decide whether to proceed with the action." (*Id.* at 1.) The notice included no explanation for why the two governments had not completed their investigations in the more than twenty-eight months since Relators had filed their complaint. The notice also did not mention the United States' presentation of its factual "findings" to Defendants, nor that it had already informed Defendants of its conclusion that they had violated the FCA.

Construing the notice as one declining intervention under the statute, the Court unsealed the complaint on August 13, 2019. (Dkt. No. 42.) A little more than a month later, in late

September, the United States made a significant settlement demand of Defendants. Even so, the United States and Tennessee still did not seek to intervene in the action. Roughly three months later, on December 23, 2019, Defendants moved to dismiss Relators' complaint, arguing that Relators have failed to plead fraud with particularity, failed to plausibly allege the falsity and scienter elements of their FCA claims, and are precluded from pursuing their claims by the FCA's public disclosure bar. (*See* Dkt. No. 55.) Relators filed a response to Defendants' motion roughly a month later.[1] (*See* Dkt. No. 63.)

Finally, on February 10, 2020—just three days before Defendants were to file their reply in support of the motion to dismiss—the United States moved to intervene. (*See* Dkt. No. 65.) The United States' motion came more than ***thirty months*** after the original statutory intervention deadline would have expired, ***six months*** after the United States had presented its investigative "findings" to Defendants, and ***four months*** after the United States sought to extract a settlement from Defendants. The United States' motion provides no meaningful explanation for this delay. Instead, it asserts that there is "good cause" for the United States' belated intervention because Relators have consented and the United States has purportedly now "completed" its investigation. (Dkt. No. 66 at 2.) Besides seeking permission to intervene, the United States' motion also seeks to add two new individual defendants and requests that the entire case be stayed for three months, so that the United States can draft a complaint-in-intervention.

Two weeks after the United States moved to intervene, the state of Tennessee moved to intervene as well. (*See* Dkt. No. 72.) Tennessee's motion is little more than a page long and states that it seeks to intervene "for the same reasons as the United States." (*Id.* at 1.) Neither motion identifies even a single new fact that the governments have learned since the case was

_____

[1] As of this filing, Defendants' motion to dismiss remains pending.

6

unsealed. All the same, the Magistrate Judge's Report and Recommendation (the "R&R") recommended that the Court grant both motions. (*See* Dkt. No. 84.)

## STANDARD OF REVIEW

Review of a magistrate judge's report and recommendation is *de novo*. *See* Fed. R. Civ. 72(b). "This *de novo* review requires the Court to re-examine all relevant evidence previously reviewed by the magistrate judge to determine whether the recommendation should be accepted, rejected, or modified in whole or in part." *Rymer v. Lemaster*, 2017 WL 4411790, at *1 (M.D. Tenn. Oct. 4, 2017).

The FCA provides that the government may intervene in a *qui tam* action after initially declining intervention, only if the government can establish "good cause." 31 U.S.C. § 3730(c)(3). The analogous Tennessee statutes under which Relators have asserted claims contain similar provisions. *See* Tenn. Code Ann. § 71-5-183(c)(3); Tenn. Code. Ann. § 4-18-104(f)(2)(A). Although the statutes do not define "good cause," courts have identified several factors bearing on whether good cause exists, including the existence of "new and significant evidence" and the degree of any prejudice intervention would cause to the defendants. *U.S. ex rel. Hall v. Schwartzman*, 887 F. Supp. 60, 62 (E.D.N.Y. 1995).

## ARGUMENT

The Magistrate Judge concluded that good cause exists for the United States and Tennessee to intervene long after the Court's intervention deadline because: (1) the United States' continued investigation of Relators' allegations has identified "new evidence" that supposedly warrants belated intervention; (2) Relators have consented to the belated intervention; and (3) belated intervention would not unduly delay the action or prejudice Defendants. As further explained below, each of those conclusions is incorrect, and the Court should therefore decline to adopt the R&R.

## I.    The United States Has Not Identified "New Evidence" to Support Its Untimely Request to Intervene.

The Magistrate Judge first determined that belated intervention is warranted because the United States and Tennessee have "identified sufficient new evidence to support a finding of good cause." (Dkt. No. 84 at 10.) What the Magistrate Judge identified, however, was not new *evidence*, but additional *investigation* that the United States has undertaken in the time since the complaint was unsealed. (*See id.* at 9 (stating that the unidentified new evidence "comes from analysis of the types of remunerations allegedly given by defendants for referrals … and from additional witness interviews").) That is because the United States itself has failed to point to any "new evidence." Instead, like the Magistrate Judge, the United States has described only more investigative activity, with no indication that those efforts have produced any new evidence or uncovered any new facts. (*See* Dkt. No. 66 at 2 ("The United States continued analyzing documents received from Defendants and conducted more witness interviews.").)

To be sure, the government's discovery of additional evidence may in some cases amount to good cause justifying untimely intervention. *See, e.g.*, *U.S. ex rel. Roberts v. Sunrise Senior Living, Inc.*, 2009 WL 499764, at *1 (D. Ariz. Feb. 26, 2009) (noting that courts have interpreted good cause to include "the discovery of additional information"). As both case law and the relevant legislative history make clear, however, this additional evidence must be both "*new*" and "*significant*." S. Rep. 99-345 at 26-27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291-92 (emphasis supplied); *see also Schwartzman*, 887 F. Supp. at 62. Not just *any* additional facts will do. Facts that justify intervention after the government has first declined to intervene must be ones that "escalate[s] the magnitude or complexity of the fraud" or otherwise meaningfully change the government's view of the case. S. Rep. 99-345 at 26-27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291-92; *see also, e.g.*, *Schwartzman*, 887 F. Supp. at 62 (describing "the

8

subsequent discovery of new and significant evidence which has altered [the government's] view" as "the circumstances which Section 3730(c)(3) was intended to address").

Here, the United States has sought to justify belated intervention by citing *only* ongoing investigative efforts, not any new facts or evidence that have changed its view of the case. For instance, it asserts that it has "interviewed additional witnesses," but does not identify those witnesses or even hint at what it learned from them. (Dkt. No. 66 at 4.) It says it has "continued reviewing the documents produced by Defendants," but does not explain what facts those documents revealed. (*Id.* at 4-5.) And while it reports that it has "obtained and analyzed new high-level Medicare claims data"—which it says helped "identify FCA violations"—it provides no specific description of the data it analyzed or any explanation of how that data evinces fraud. (*Id.* at 5.) Without describing what facts it learned from any of these investigative steps, the United States cannot possibly show that those facts were "significant."

Nor does the United States explain why it could not have completed these investigative steps long before the Court's intervention deadline. Defendants' document productions were complete *months* before that deadline, and the United States fails to explain why it needed more time to review them. The United States also fails to explain why the unnamed witnesses it recently interviewed could not have been interviewed much earlier. As for the claims data the United States cites, that data has always belonged to the government, and thus the United States could have "analyzed" it at any time since the complaint was filed more than three years ago. Accordingly, even if the United States' recent investigative steps *had* identified facts that changed its view of the case, those facts would be "new" only because of the United States' own lack of diligence. The government's dragging of its feet, however, does not amount to good cause. *See U.S. ex rel. Martin v. Life Care Ctrs. of Am., Inc.*, 912 F. Supp. 618, 625 (E.D. Tenn. 2012) ("'[G]ood cause' [is not] established merely upon a showing that the Government

9

was overburdened and had not had a chance to address the complaint." (quoting S. Rep. No. 99-345 at 25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289-90)).[2]

In essence, by failing to point to any "new and significant" evidence, the United States asks the Court to simply take its word that "good cause" exists. But, the "good cause" standard is not satisfied just because the government says so. Indeed, in the analogous context of assessing "good cause" for extensions of the FCA's 60-day seal period, Congress has expressed that courts should "weigh carefully" and "carefully scrutinize" the government's requests for an extension. S. Rep. No. 99-345 at 24-25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289-90. In other contexts, courts have similarly held that establishing good cause requires a movant to "articulate specific facts," as "mere conclusory statements" will not suffice. *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001) (discussing the "good cause" standard for obtaining a protective order). Here, the governments have not articulated *any* specific facts they have learned from their continued investigation. Instead, they rely only on conclusory statements about needing more time to "complete[]" their investigation. (Dkt. No. 66 at 4-5.) Moreover, Defendants do not even have the means to fully assess the credibility of that assertion because the governments' earlier statements to the Court about the progress of their investigation—presumably made in their repeated requests for extensions of the intervention deadline—remain under seal. The United States has refused to agree to the unsealing of those filings. (*See* Dkt. No. 80 at 8.)

Tellingly, in other FCA cases in which the United States has sought to belatedly intervene, it has made far more detailed showings of "*new and significant*" evidence than anything it has offered here. For example, in *Hall v. Schwartzman*—a case the Magistrate Judge

---

[2] It bears repeating that the conduct on which relators premise their alleged FCA violations, which includes allegations regarding Defendants' business model as a provider of secondary surgical eye care and a provider that co-managed post-operative care for cataract surgeries, was based on information available to the public and therefore, the government, well before this action was ever filed. (*See* Mem. in Support of Mot. to Dismiss (Dkt. No. 55).)

cited—the United States submitted a letter with its motion to intervene that described the testimony of 24 newly located witnesses and explained how their testimony changed its view about the "scale of the alleged fraud." 887 F. Supp. at 62. Similarly, in another case the Magistrate Judge cited, the United States specifically described new evidence that "refute[d]" the defendants' representations and explained how that evidence "suggest[ed] an escalated scope of the fraud." *Guthrie on behalf of United States v. A Plus Home Health Care, Inc.*, 2013 WL 12384137, at *1 (S.D. Fla. Jul. 8, 2013); *see also, e.g.*, *U.S. ex rel. Stone v. Rockwell Int'l Grp.*, 950 F. Supp. 1046, 1049 (D. Colo. 1996) (citing declarations filed by a government attorney that "persuasively show[ed]" that specific new information was "important to the decision to intervene"). These cases show that the government has no qualms about identifying and describing new evidence to support intervention when it has such evidence to offer; that the government has not even attempted to do so here only undermines the government's position.[3]

Without new and significant evidence, mere statements about additional investigation cannot support untimely intervention. If it could, this Court's intervention deadlines would become little more than suggestions, as the United States could *always* intervene long after the deadline simply by keeping its investigation "open" and later pointing to subsequent investigative efforts. As a practical matter, such a rule would eliminate the intervention deadline altogether, in clear violation of congressional intent. S. Rep. No. 99-345 at 24-25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289-90 (stating that courts should "weigh carefully" and "carefully scrutinize" the government's requests for extensions of the seal period and

---

[3] In a similar admission-by-omission, the United States acknowledges that courts have "found good cause when the government realized the magnitude of the alleged fraud was much larger than it originally anticipated," yet it studiously declines to assert it had come to such a realization here. (*See* Dkt. No. 66 at 4.) Instead, the United States asserts only that its investigation has "culminated in a finding of false claims." (*Id.* at 1.) The government omits to mention that it informed Defendants of its conclusion in this regard months before it sought to intervene and even before the Court's August 2019 intervention deadline.

11

intervention deadline).  This Court should not endorse that result here by accepting the United States' conclusory and self-serving assertions about the results of its continued investigation.

## II.    Relators' Consent to Intervention Does Not Establish Good Cause.

The United States also asserts that good cause for belated intervention exists because Relators have consented, a fact the Magistrate Judge cited as "***weigh[ing] heavily in the favor of allowing it***."  (Dkt. No. 84 at 10 (emphasis supplied).)  But, even if a relator's consent may provide *some* support for permitting untimely intervention, it does not alone amount to good cause without any other compelling justification.  Here, no other compelling justification exists.

In emphasizing the importance of the Relators' consent, the Magistrate Judge cited *Stone*, a case in which a district court concluded that "the 'good cause' requirement of § 3730(c) was intended to protect the interests of the relator."  950 F. Supp. at 1049.  More recent cases, however, have rejected that conclusion.  In one such case, the district court explained that equating a relator's consent to "good cause" for late intervention "would virtually eliminate the 'good cause' requirement" altogether, as "a relator may assent for any reason or no reason at all."  *U.S. ex rel. Drennen v. Fresenius Med. Care Holdings, Inc.*, 2017 WL 1217118, at *5 n.2 (D. Mass. Mar. 31, 2017).  Citing *Drennen*, another district court has likewise concluded that the "good cause" analysis need not turn solely on the interests of the relator.  *See Sharpe ex rel. U.S. v. Americare Ambulance*, 2017 WL 2986258, at *1 (M.D. Fla. Jul. 13, 2017).

As *Drennen* explained, construing the "good cause" standard to focus only on the relator's interests would present hardly any barrier to late interventional at all.  That is because relators will usually welcome the government's involvement (even at the price of a slightly lower recovery) given the greater resources, leverage, and access to information that the government brings to bear.  Moreover, equating relator consent to "good cause" would grant relators veto power over court intervention deadlines, as a relator could authorize intervention any time after

12

expiration of the deadline simply by granting his or her consent. Had Congress intended that result, it would not have required "good cause." Nor would it have made *courts*, rather than relators, the arbiters of whether good cause exists. In sum, because the United States has identified no other good cause for belated intervention, Relators' consent will not suffice.

Likely recognizing this reality, the United States has also contended that good cause is present based on its need to "protect[] the integrity of government programs." (Dkt. No. 80 at 5.) The Magistrate Judge, however, did not appear to credit that argument—and for good reason. If vague appeals to the "public interest" sufficed to establish good cause, good cause would *always* be present in FCA cases. In any event, the public interest does not require the United States' intervention, as Relators can still proceed on the public's behalf even without the government's participation. In fact, allowing Relators to proceed on their own would *facilitate* the protection of government programs by freeing up the government's counsel and resources to pursue other instances of alleged fraud. In addition, if the United States and Tennessee for some reason do not believe Relators' participation in this action is sufficient to protect their interests, they can always file a separate action of their own, as the United States has already indicated to Defendants it would do if intervention were not allowed. What they cannot do is belatedly intervene in an existing *qui tam* action without a meaningful showing of good cause.

## III. The Government's Untimely Intervention Would Prejudice Defendants and Undermine Congressional Intent.

The Magistrate Judge also concluded that Defendants "will not be unduly prejudiced" by allowing the two governments to intervene at this stage. (Dkt. No. 84 at 10.) For that conclusion, the Magistrate Judge explained that "only six months elapsed between the Governments' decision not to intervene and their current motion," and "formal discovery has not yet begun." (*Id.*) Those isolated facts, however, do not fully account for the history of this

action, nor do they appropriately consider the circumstances in which the governments now seek to intervene.

For starters, although the United States may have waited "only six months" after the case was unsealed before filing its motion, it had already been granted more than *two years* to investigate Relators' allegations and reach an intervention decision. During that time, Defendants were forced to endure burdensome one-sided discovery, ultimately producing tens of thousands of pages of documents and answering extensive written interrogatories. Defendants undertook all of that effort (and absorbed the associated expense) without any chance to challenge Relators' allegations. As a result, by the time the complaint was finally unsealed, Defendants had devoted *years*' worth of effort and expense to this action, depleting their capacity to fully defend themselves now. Viewed in that context, six *more* months of delay is hardly the mere modest inconvenience that the government suggests.[4] *See, e.g.*, *U.S. ex rel. Brasher v. Pentec Health, Inc.*, 338 F. Supp. 3d 396, 399 (E.D. Pa. 2018) (explaining that although the government's request for an extension of the intervention deadline "might [have] appear[ed] modest on its face by seeking just three months … the reality was that the request came five years after the outset of the litigation and after ten extensions had been granted").

In fact, the United States has *already* had far more time to make an intervention decision than Congress contemplated when drafting the FCA. The FCA itself provides that a *qui tam* complaint shall remain under seal for only sixty days, after which the government must elect either to proceed with the action or decline to intervene. 31 U.S.C. § 3730(b)(2). Although

---

[4] More delay would be all the more prejudicial given the ongoing global health crisis. Defendants are healthcare providers who derive nearly all of their revenue from elective surgical procedures. As a result of the COVID-19 global pandemic, Defendants have been forced to cancel or postpone a significant portion of these procedures in recent months, leading to devastating losses of revenue. Thus, having already had to endure years of one-sided discovery through the government's protracted investigation, Defendants would now be forced to litigate against the government with depleted financial resources.

14

extensions of that 60-day period may be granted for good cause, the legislative history indicates that, "with the vast majority of cases, 60 days is an adequate amount of time to allow Government coordination, review and decision." S. Rep. 99-345 at 24-25 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289-90. Here, the United States received six separate extensions of the initial 60-day seal period, extending the time for making an intervention decision from *two* months to over *twenty-eight* months. By declining to grant any more extensions, the Court itself seems to have concluded that there was not "good cause" for any additional delay. Yet the United States claims that it needed six *more* months—three times the length of the initial statutory seal period—before it could decide whether to intervene.

In the meantime, memories have faded and evidence likely has been lost, all before Defendants have had *any* opportunity to take reciprocal discovery from the United States. *See U.S. ex rel. Costa v. Baker & Taylor, Inc.*, 955 F. Supp. 1188, 1189 (S.D. Cal. 1997) (noting that FCA defendants "have a legitimate interest in building their defense while the evidence is still fresh"). And, as with any business, every additional month they spend enmeshed in litigation and under government scrutiny only makes it more difficult for Defendants to grow their business, engage in transactions, and recruit and retain personnel. Permitting the United States to intervene now would only extend the delay, further magnifying the attendant prejudice.

The government's delay in intervening has also afforded it other strategic advantages, none of which Congress intended. As one court has explained, the 60-day seal period and intervention deadline "enable the Government to perform a relatively straightforward task: ascertain the status quo and come to a decision as to whether it will intervene." *Life Care*, 912 F. Supp. 2d at 623 (internal quotation marks omitted). By contrast, the seal period is not intended to be "a means of conducting unchecked discovery in an effort to build a more complete case" against the defendant. *Id.*; *see also Costa*, 955 F. Supp. at 1191 ("This practice of conducting

15

one-sided discovery for months or years while the case is under seal was not contemplated by Congress and is not authorized by the [FCA].").  Nor is the time allotted to the government for making an intervention decision intended "to provide an extra bargaining chip in settlement negotiations."  *Costa*, 955 F. Supp. at 1191.

Here, however, that is exactly how the United States has used the extended seal period. For more than two years while the case remained under seal, the United States conducted a detailed and burdensome factual investigation, far exceeding the scope of what was needed to "ascertain the status quo and come to a decision" about intervention.  *Life Care*, 912 F. Supp. at 623.  As just one such example of the United States' opportunistic conduct, it waited until just *days* before the intervention deadline to conduct CID depositions of several of Defendants' witnesses, suggesting those depositions had more to do with securing testimony for use in litigation than they did with making an intervention decision.  Further confirming this conclusion, immediately following a deposition taken by the government and long before it sought to intervene, the government made a detailed factual presentation to Defendants and soon thereafter sought to extract a settlement based on alleged violations of the FCA.  These actions directly contradict the United States' protestations that it lacked the information needed to make an intervention decision before the Court's deadline.  Indeed, they suggest that the *real* reason for the delay was to secure a strategic advantage.  As the *Life Care* court recognized, "[i]t defies logic to suggest that the Government would give Defendant a 'lengthy and detailed' report of an investigation and attempt to obtain a settlement based on claims that it did not intend to pursue." *Id.* at 624.

By waiting so long before seeking to intervene, the United States also ensured that Defendants had fully briefed their motion to dismiss *before* the United States needed to begin drafting its complaint-in-intervention.  That is significant because allowing the United States to

16

intervene now would make Defendants' efforts a waste of time and expense. Those efforts have also granted the United States a preview of Defendants' arguments in favor of dismissal, which the United States could now use to plead around any potential deficiencies. Securing this kind of strategic advantage is not the kind of "good cause" the FCA contemplates as justifying untimely intervention. If it were, the United States would likely *always* decline to intervene at first, only to re-enter the case when most convenient based on the purported "completion" of its investigation.

The Magistrate Judge acknowledged that Defendants would be harmed by their wasted efforts briefing the motion to dismiss, but concluded that this harm was "not weighty enough to prevent intervention." (Dkt. No. 84 at 11.) But, it is not Defendants' burden to offer compelling reasons for "prevent[ing]" intervention. Instead, the burden rests with *the government* to establish "good cause" warranting intervention. Neither the United States nor Tennessee has done so here, particularly given the prejudice their intervention would cause to Defendants.

## IV. Tennessee Has Not Established Good Cause to Intervene.

Finally, even if the United States were to show good cause to intervene after the Court's deadline, the state of Tennessee has not. Rather than cite any independent good cause for its belated intervention, Tennessee's motion cites "the same reasons as the United States laid out in its Memorandum in Support." (Dkt. No. 72.) But, the United States' motion barely mentions Tennessee at all, and it does not try to argue that *Tennessee's* belated intervention would also satisfy the "good cause" requirement. The United States' motion speaks only for the United States. (*See* Dkt. No. 66 at 1 ("Good cause exists to support *the United States*' motion to intervene … and … to permit *the United States* to file a complaint in intervention." (emphasis supplied).)

17

The difference between the United States and Tennessee in this case is not just semantic. Relators' claims on behalf of Tennessee are asserted under separate state false claims acts, which protect *Tennessee*'s public programs, not the federal fisc. Although the relevant provisions of these statues are similar to those of the federal FCA, they are not identical,[5] and in any case, they impose distinct obligations on the state. The statutes require Tennessee to conduct its *own* investigation and reach its *own* decision about intervention based on the integrity of its *own* government programs. Thus, while the scope of their investigations may well overlap, there is no reason why Tennessee's investigation should necessarily mirror the United States'. Nor is it inevitable that both parties should make the same decision about whether to intervene.

For those reasons, the fact that the United States may argue that it has good cause for late intervention says next to nothing about whether Tennessee does. Indeed, given the lack of detail to support the United States' motion, its recent investigative efforts may well have focused solely on the *Medicare* program, which would not implicate Tennessee at all. Tennessee's motion, meanwhile, says nothing about its own investigation, does not identify any new facts it has learned since the case was unsealed, and makes no assertion that its view of this case has changed since that time. For that matter, unlike the United States, Tennessee has not even asserted that it has identified any false claims. Accordingly, Tennessee's tag-along motion does not come close to establishing good cause for untimely intervention, and the Court should deny Tennessee's motion even if it grants the similar motion of the United States.

---

[5] The Tennessee Medicaid False Claims Act, like the federal FCA, requires the state to establish "good cause" for intervening after expiration of the deadline set by the court. *See* Tenn. Code Ann. § 71-5-183(c)(3). Belated intervention under the separate Tennessee False Claims Act ("TFCA"), however, is more limited. That statute permits the state to intervene after initially declining intervention only if "the interest of the state … is not being adequately represented by the qui tam plaintiff." Tenn. Code. Ann. § 4-18-104(f)(2)(A). Tennessee has not even tried to make that showing here. Thus, at the very least, the Court should deny Tennessee's motion to intervene relative to Relators' TFCA claim.

18

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that this Court deny the

United States' and Tennessee's motions to intervene.

Dated this 14th day of August 2020.

<div style="margin-left: 40%;">

Respectfully submitted:

BASS BERRY & SIMS PLC

/s/ *Scott D. Gallisdorfer*
Matthew M. Curley
Molly K. Ruberg
Scott D. Gallisdorfer
150 Third Avenue South, Suite 2800
Nashville, TN 37201-3001
Telephone: (615) 742-6200
mcurley@bassberry.com
mruberg@bassberry.com
scott.gallisdorfer@bassberry.com

BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
Alan E. Schabes (*admitted PHV*)
200 Public Square, Suite 2300
Cleveland, OH 44114-2378
Telephone: (216) 363-4589
aschabes@beneschlaw.com

BENESCH, FRIEDLANDER, COPLAN &
ARONOFF LLP
Juan Morado, Jr. (*admitted PHV*)
333 West Wacker Drive, Suite 1900
Chicago, IL 60606
Telephone: (312) 212-4967
jmorado@beneschlaw.com

*Attorneys for Defendants SouthEast Eye*
*Specialists, PLLC, SouthEast Eye Surgery*
*Center, LLC, and Eye Surgery Center of*
*Chattanooga, LLC*

</div>

19

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on August 14, 2020, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following, and/or served the foregoing via U.S. Mail and electronic mail upon:


Ellen Bowden McIntyre
UNITED STATES ATTORNEY'S OFFICE
MIDDLE DISTRICT OF TENNESSEE
110 9th Avenue South, Suite A-961
Nashville, Tennessee 37203-3870
ellen.bowden2@usdoj.gov

Philip H. Bangle
TENNESSEE ATTORNEY GENERAL'S
OFFICE
PO Box 20207
Nashville, Tennessee 37202-0207
Philip.Bangle@ag.tn.gov

William Michael Hamilton
PROVOST, UMPHREY LAW FIRM, LLP
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
mhamilton@pulf.com

Amy L. Easton
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue, N.W.
Washington, District of Columbia 20036
aeaston@phillipsandcohen.com

Jeffrey W. Dickstein
PHILLIPS & COHEN LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 2790
Miami, Florida 33131
jdickstein@phillipsandcohen.com


                                    /s/ *Scott D. Gallisdorfer*