UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE OF TENNESSEE *ex rel.* GARY ODOM and ROSS LUMPKIN, | ) ) ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) No. 3:17-cv-00689 |
| | ) |
| SOUTHEAST EYE SPECIALISTS, PLLC, SOUTHEAST EYE SURGERY CENTER, LLC, EYE SURGERY CENTER OF CHATTANOOGA, LLC, DARYL F. MANN, and JOHN R. BIERLY, | ) ) ) ) ) ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION

It's been said that "the eyes are the window to one's soul." When those panes become cloudy or hazy, cataract surgery may be the solution. This *qui tam* action is about the follow-up care to such surgery, and the parties' inability to see eye-to-eye on whether Defendants' allocation of that care is lawful.

Plaintiffs are Gary Odom, the Executive Director of the Tennessee Association of Optometric Physicians ("TAOP"), and Dr. Ross Lumpkin, an optometrist in Camden, Tennessee and past president of that association. In the First Amended Complaint, they sue five Defendants (collectively "SEES"): (1) SouthEast Eye Specialists, PLLC ("SEE"), a medical practice group employing 10 optometrists, and 11 ophthalmic surgeons who perform approximately 12,000 cataract surgeries a year; two affiliated surgery centers ("SECS"), one in Knoxville (Southeast Eye Surgery Center, LLC), the other in Chattanooga, Tennessee (the Eye Surgery Center of Chattanooga, LLC); and the

co-founders and top corporate officers of SEES, Dr. Darryl F. Mann, an optometrist, and Dr. John R. Bierly, an ophthalmic surgeon.

In Plaintiffs' view, Defendants have implemented a scheme – developed and directed by Drs. Mann and Bierly – to provide kickbacks to optometrists in order to induce them to refer their patients to Defendants' surgical centers, including patients covered by public health insurance programs such as Medicare, Medicaid, and TennCare. From Plaintiffs' perspective, the scheme violates the federal health care Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and, in turn, the submission of claims for payment constitute fraud for purposes of both the federal False Claims Act ("FCA"), 31 U.S.C. § 3728, *et seq.,* and its state-law counterpart, the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et. seq*.

SEES sees things differently. Defendants claim to use an entirely lawful, referral-based, co-management business model. True, that model helps the bottom-line, but there is nothing unlawful about a business endeavoring to make and maximize profits. Nor have they committed any fraud. Accordingly, Defendants have filed Motions to Dismiss the Amended Complaint (Doc. Nos. 132, 138), as well as a Motion to Strike (Doc. No. 135).

## I. Factual Background and Procedural Posture[1]

Unlike ophthalmologists, optometrists are not medical doctors. Rather, optometrists provide primary eye care. This generally includes eye exams, vision testing, prescribing corrective lenses when appropriate, and monitoring and managing eye disease. In the course of their practice,

---

[1] Because the pending motions are directed at the allegations of fact contained in the Amended Complaint, that document serves as the basis for the following recitation of fact. Those facts are accepted as true for purposes of both the Motions to Dismiss, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) and the Motion to Strike, Brown & Williamson Tobacco Corp. v. United States, 201 F.2d 819, 821 (6th Cir. 1953).

2

optometrists frequently discover cataracts, which is a clouding of the natural lens of an eye. Often upon that discovery, patients are referred to an ophthalmologist for surgery.

Cataract surgery is a relatively straightforward procedure, taking between 5 and 10 minutes per eye. During the surgery, the cloudy natural lense is replaced with an artificial one. The typical lens eliminates the haze, but does not correct underlying vision problems, such as an astigmatism or the need for reading glasses. Those problems, however, can be corrected with a premium lens that costs more.

Even though it has optometrists on staff, SouthEast Eye Specialists is a referral center and does not provide primary eye care. Instead, its cataract surgeons receive patients from outside optometrists or doctors on a referral basis.

Plaintiffs claim that SEES has devised a scheme that makes it lucrative and beneficial for optometrists to refer their patients exclusively to SEES for cataract surgery at one of its two surgical centers. SEES allegedly does so through a number of financial inducements.

One method is to provide optometrists with freebies. This includes free continuing education that all Tennessee optometrists are required to complete each year. It also includes free dinners and drinks, lunches for the optometrist and his or her staff, baseball games, golf outings, and other events. Those with high referral rates may even be selected to sit on SEES' advisory board. In contrast, those that fall short of the expected number of referrals are taken off the mailing lists for SEES' events.

Another financial inducement SEES employs is through its "co-management model." Under that model, the ophthalmologist that performs the cataract surgery receives 80% of the fee, while the referring optometrist who does the follow-up care receives 20%. Plaintiffs acknowledge that such

3

a model – properly employed and implemented – can be beneficial to patients because the surgery is an outpatient procedure and follow-up care is required. Thus, by way of example, if the surgery center is some distance from the patient's home, it is more convenient for the patient to seek follow-up care (the day after surgery, again 3-4 days later, and then a few weeks later) at the local optometrist, rather than returning to the surgery center. Plaintiffs insist that SEES corrupts this model because the patient really has no choice as to where he or she will receive cataract surgery if the local optometrist has an arrangement with SEES. That surgery will more than likely occur at a facility owned and operated by SEES, making patient choice illusory.

A third financial inducement relates to up-selling. An optometrist who convinces his or her patient to request premium lenses that correct vision instead of the standard clear lens, receives a bonus from SEES of $150, or more, per lens. For Medicaid and TennCare patients, this results in a significant out-of-pocket cost because those programs do not cover premium lenses. Indeed, one such premium lens costs the patient an additional $1,695 per eye, a different premium lens offered by SEES costs almost $3,000 per eye. The referring optometrist receives $150 per eye for a patient's purchase of the former, and $300 per eye for purchase of the latter. And, even it the patient declines the premium lens, the referring optometrist still wins because he or she will likely be the prescriber of corrective lenses the patient may need and will reap the profits associated therewith.

Sometime around 2010, Plaintiffs learned that SEES and other cataract surgery practices were promoting and hosting more and more seminars and free dinners. They also noticed a significant decline in the number of optometrist who attended TAOP education seminars. Their curiosity piqued, Plaintiffs began reading promotional materials for these events, and discussed the matter with other practitioners.

4

In 2016, Dr. Lumpkin attended a SEES continuing medical education seminar and heard and saw SEES' pitch promoting co-management as a revenue opportunity for optometrists. Likewise, Dr. Lumpkin heard similar sales presentation at a SEES seminar he attended.

On April 7, 2017, Plaintiffs (as Relators in the name of the United States) filed a Complaint alleging that the three corporate Defendants had "defrauded—and continue to defraud—Medicare and Medicaid of tens of millions of dollars" through a kick-back scheme involving the referral from optometrists. (Doc. No. 1 at 2). In keeping with the *qui tam* provisions of the FCA, the Complaint was filed under seal to allow the Government to decide whether it desired to intervene.

At the Government's request, the initial 60-day sealing period was extended again and again. After six such extensions, the United States and the State of Tennessee were given until August 9, 2019, within which to notify the Court as to whether they desired to intervene. (Doc. No. 40 at 1). On that deadline the United States and Tennessee filed a Joint Notice stating that they were not intervening "at this time" because they had not completed their investigation, even though 28 months had passed since the filing of the Complaint. (Doc. No. 43). The Complaint was then unsealed and Defendants moved to dismiss.

On February 10, 2020, the United States filed a "Motion to Intervene, Add Two Defendants, and Stay the Suit for 90 Days." (Doc. No. 65). The State of Tennessee joined in on that request two weeks later. (Doc. No. 72). These filings were made when briefing on the Motion to Dismiss was almost completed, some six months after the Court's deadline for intervention, and almost three years after the original Complaint was filed. The Motions to Intervene were denied by the Court because neither the United States nor the State of Tennessee established good cause for the delay. (Doc. No. 104).

The Government appealed the denial of the request to intervene, but voluntarily dismissed that appeal weeks later. (Doc. No. 124). On May 6, 2021, Plaintiffs filed the operative First Amended Complaint adding 60 paragraphs of factual allegations, and the two individual Defendants (Drs. Mann and Bierly).

## II. APPLICATION OF LAW

As noted, there are two Motions to Dismiss, one filed by the individual Defendants (Doc. No.138), and the other filed by the corporate Defendants. (Doc. No. 132). There is also a Motion to Strike filed by the corporate Defendants. (Doc. No. 135). Although there is considerable overlap amongst the motions, the Court begins with the motion to strike because it could be potentially dispositive as to all Defendants were it to be granted.

### A. SEES' Motion to Strike (Doc. No. 135)

The SEES Defendants move to strike paragraphs in the Amended Complaint that "could only have come from the U.S. Department of Justice ('DOJ'), which must have provided Relators with confidential business records and information that SEES had produced to DOJ in response to a Civil Investigative Demand ('CID')." (Doc. No. 136 at 5-6). They present the following time line of events:

•On December 1, 2017, almost eight months after the original Complaint was filed, DOJ served a CID on SEES containing 38 document requests and 16 separate interrogatories. According to Defendants, the Government made inquiry into every aspect of SEES' business;

•Between the filing of the Complaint and May 8, 2019, SEES produced documents on 13 separate occasions, containing 26,000 documents that totaled over 75,000 pages. The documents were marked "CONFIDENTIAL," and a cover letter for each production insisted that the documents were to remain confidential.

• On August 9, 2019, the United States and the State of Tennessee filed a Joint

Notice indicating their intention not to intervene.

• On December 23, 2019, Defendants filed a Motion to Dismiss

• On February 10, 2020, the Government changed course and filed a motion to intervene.

• On February 23, 2021, after the matter had been litigated before the Magistrate Judge, subsequent briefs were filed, and hearings were held in this Court, the motion to intervene was denied. At the same time, the pending motion to dismiss was denied without prejudice, and the parties were referred to mediation, which was unsuccessful.

• On May 6, 2021, the Amended Complaint was filed.

(Doc. No. 136 at 2-6).

Obviously, the SEES Defendants are not in a position to know exactly when the Government began sharing information, and this is best evidenced by their statement that, "[i]t should be *inferred* that DOJ turned over documents and information" after the Court denied the Government's Motion to Intervene. (Doc. No. 136 at 13) (emphasis added). Even though Defendants have no proof as to when document sharing began, it does seem quite odd to the Court that the turning over of documents by the Government to Relators was not mentioned earlier. After all, when considering the requests to intervene, the Government was ordered to provide "a history of this investigation from the [sic] – day 1 to the present" and "identify with particularity each and every investigative tool utilized by the Government in the progression of this investigation." (Doc. No. 93, Transcript at 23).[2] Nevertheless, as the one bringing the motion, it is SEES' burden to establish what they describe as "impermissible" use, and they have not carried that burden.

_____

[2] The Court recognizes that the primary focus of its inquiry was the period from August 9, 2019 until February 10, 2020. Still, one would have expected that the Government would have mentioned that it actually began sharing documents with Relators at the beginning of February 2019.

7

Under Rule 12(f), a court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Such motions, however, "are viewed with disfavor and are not frequently granted." Operating Eng'rs Local 324 Health Care Plan v. G & W Const. Co., 783 F.3d 1045, 1050 (6th Cir. 2015). Indeed, a "'motion to strike should be granted only when the pleading to be striken [sic] has no possible relation to the controversy.'" Parlak v. U.S. Immigration & Customs Enf't, No. 05-2003, 2006 WL 3634385, at *1 (6th Cir. Apr. 27, 2006) (citing Brown & Williamson Tobacco, 201 F.2d 819 at 822).

The allegations in the Amended Complaint are not redundant, impertinent, or scandalous, and Defendants do not argue otherwise. That leaves "immaterial" under Rule 12(f), but Defendants' motion is titled "Motion to Strike *Impermissible* Material in Relators' First Amended Complaint." (Doc. No. 135) (emphasis added). Rule 12(f) says nothing about striking "impermissible" material and, for this reason alone, the Motion could be denied.[3] See, Pena v. Taylor Farms Pacific, Inc., No. 2:13–cv–01282–KJM–AC, 2013 WL 5703505, *12 (E.D. Cal. Oct. 15, 2013) (internal citation omitted) ("Rule 12(f) does not authorize district courts to strike claims . . . precluded as a matter of law because such claims do not fall within one of the five categories [including the above four categories plus an "insufficient defense] cover[ed] by Rule 12(f)); Cruz v. Bank of New York Mellon, No. 12-CV-00846-LHK, 2012 WL 2838957, at *2 (N.D. Cal. July 10, 2012) (denying motion to strike where defendants sought "to use Rule 12(f) as a substitute for Rule 12(b)(6)," and observing that "[a]n impermissible use of a Rule 12(f) motion alone would be reason to deny Defendants' motion to strike").

---

[3] In their supporting Memorandum, Defendants attempt to make their argument fit Rule 12(f) by claiming that the matters sought to be stricken are "immaterial." They are not. They are core allegations relating to alleged fraud.

8

Regardless, the Court has inherent power to strike impermissible matter apart from Rule 12(f) and this "authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Royce v. Michael R. Needle P.C., 950 F.3d 939, 953 (7th Cir. 2020) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991); see also White v. Dep't of Justice, No. 16-CV-948-JPG-DGW, 2019 WL 653151, at *2 (S.D. Ill. Feb. 15, 2019) (noting that where matter is not covered by Rule 12(f), court has inherent power to strike if appropriate). Defendants argue that Plaintiffs abused the FCA/litigation procedures in two ways, both of which warrant as a sanction that the new paragraphs in the Amended Complaint be stricken. The Court is unpersuaded by either argument.

Defendants' first argument is largely premised on their unproven assertion that the Government provided Relators/Plaintiffs' with SEES' documents, "not as part of DOJ's investigations," but "to assist Relators with litigation." (Doc. No. 136 at 9). Based upon what can only be characterized as speculation (albeit logical speculation) as to timing, the Court is not in a position to say that the Government's sharing of the document productions was improper.

The FCA provides that "[t]he Attorney General may delegate the authority to issue civil investigative demands," and "[a]ny information obtained by the Attorney General or a designee of the Attorney General . . . may be shared with any *qui tam* relator if the Attorney General or designee determine it is necessary as part of any false claims act investigation." 31 U.S.C. § 3733(a)(D). This "provision was added to the False Claims Act in 1986 . . . to remedy the 'serious roadblocks to obtaining information as well as weaknesses in [investigative tools],' including the government's limited investigative resources and the fact that civil attorneys 'have no authority to compel production of documents or depositions prior to filing suit.'" United States v. Kernan Hosp., No.

CIV.A. RDB-11-2961, 2012 WL 5879133, at *3 (D. Md. Nov. 20, 2012) (quoting S. Rep. No. 99–345, at 3–6 (1986)). "Congress subsumed counsel in its reference to relator" because "the rules of professional responsibility forbid the Government from communicating with a represented party without going through counsel." United States ex rel. Nichols v. Computer Scis. Corp., 499 F. Supp. 3d 32, 43 (S.D.N.Y. 2020); see also 31 U.S.C. § 3733(1)(8) (stating that false claims law investigators may utilize documentary material for "official use," with "official use" including "communications with Government investigators, auditors, consultants and experts, the counsel of other parties, arbitrators and mediators, concerning an investigation, case or proceeding").

In this case the Government asserts – and Defendants do not dispute – that the Attorney General's designee in the form of the Director of the DOJ's Commercial Litigation Branch, Fraud Section approved the sharing of information with the Relators. They argue, however, that this was not "necessary" within the meaning of the statute because Relators are not "fraud claim investigators," nor are they former employees who might have some insider knowledge that would be helpful to the Government. Rather, Relators are competitors. (Doc. No. 136 at 9).

Under the clear language of the statute, the decision of what is "necessary" lies with the Attorney General or his or her designee, and "the statute does not require the Government to submit a sworn declaration of necessity before sharing CID materials with relator's counsel." Nichols, 499 F. Supp. 3d at 43 n.15; cf. United States v. Witmer, 835 F. Supp. 208, 218 (M.D. Pa. 1993) (stating that court lacks "plenary authority to substitute its judgment for that of the Attorney General" when the Attorney General determines that the "issuance of a CID is necessary"; United States v. Seitz, No. MS2-93-063, 1993 WL 501817, at *4 (S.D. Ohio Aug. 26, 1993) (same). Nor does the statute limit sharing only to former employees or insiders.

10

Given the discretion afforded the Attorney General, the Court cannot reject out-of-hand the Government's assertion that sharing with the Relators was "necessary" because of the large number of documents that needed to be reviewed.  Indeed, a CID is an "investigative tool" intended to "provide[] the government 'with a means to assess quickly, and at the least cost to the taxpayers or to the party from whom information is requested, whether grounds exist for initiating a false claim suit.'" United States v. Markwood, 48 F.3d 969, 979 (6th Cir.1995) (citation omitted).  Who knows what assistance the Government thought Relators and their counsel might be, particularly given that Relators are an optometrist and the Executive Director of TAOP.  It is enough that the Attorney General's designee found sharing to be "necessary."

Defendants' second argument is also based in part upon their belief about the time line of events, *i.e.* that the Government improperly used the seal period as a way to conduct "pre-intervention" discovery.  From this premise, Defendants argue that "[j]ust as Rule 9(b) does not permit *qui tam* relators to file a deficient complaint and petition the Court for discovery to cure those deficiencies, *qui tam* relators likewise are not permitted to use information learned in discovery to remedy a complaint that is otherwise deficient under Rule 9(b)."  (Doc. No. 136 at 15).

As primary support, Defendants rely on United States *ex rel*. Bingham v. HCA, Inc., 783 Fed. Appx. 868, 876 (11th Circ. 2019).  That case, however, is wholly inapposite because it involved discovery obtained directly from defendant while a motion to dismiss was pending that was then used in an amended complaint.  Here, in contrast, Relators obtained the CID material from the United States as a part of the Government investigation of the matter.  This is not a distinction without a difference, as a number of cases make clear.

"[C]ourts that have addressed the present situation appear united in their allowance of

11

amended complaints based on information gleaned from government investigations." Vassallo v. Rural/Metro Corp., No. CV-15-00119-PHX-SRB, 2017 WL 4570706, at *1 (D. Ariz. Oct. 5, 2017

For example, in United States *ex rel.* Underwood v. Genentech, Inc., 720 F. Supp. 2d 671, 680 (E.D. Pa. 2010), the court observed it could "find no authority . . . barring amendments based on discovery the relator obtained from the Government. Indeed . . ., courts have suggested just the opposite: that there is no need to relax the Rule 9(b) pleading standard in a *qui tam* case if the relator can incorporate into his complaint allegations based on discovery he has obtained from the Government." Id. In fact, "[i]n many of these cases, the information needed to fill the gaps of an inadequately pleaded complaint will be in the government's hands." United States *ex rel.* Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 230 (1st Cir. 2004). Moreover,

> if a relator expects the DOJ vigorously to investigate his allegations, he will not file a "bare bones" complaint in the hope of later amending it with evidence the DOJ obtained during its investigation. Indeed, the less a relator brings to the DOJ, the less likely the DOJ is to conduct any investigation. Similarly, if the DOJ believes a qui tam complaint warrants investigation, allowing the relator to use information the DOJ learns during that investigation is not likely to encourage "parasitic" litigation intended only to extort a settlement from the Defendant.

Genetech, 720 F. Supp.2d 681 (internal citations omitted); see also Vassallo, 2017 WL 4570706, at *1-2 (finding "defendant's appeals to public policy unavailing," and "see[ing] no reason to craft a new rule here" that would disallow using CID material in drafting an amended complaint); United States *ex rel.* Banigan v. Organon USA Inc., No. CIV.A. 07-12153-RWZ, 2011 WL 794915, at *1 (D. Mass. Feb. 28, 2011) (collecting cases for the proposition that "other courts have either held or expressly presumed that, in at least some instances, a relator may reinforce the complaint with information obtained from government documents").

"The reluctance of courts to permit *qui tam* relators to use discovery [such as in Bingham]

to meet the requirements of Rule 9(b) reflects, in part, a concern that a *qui tam* plaintiff, who has suffered no injury in fact, may be particularly likely to file suit as 'a pretext to uncover unknown wrongs.'" Karvelas, 360 F.3d at 231. It also "reflect[s] the federal judiciary's reluctance to relax Rule 9(b)'s pleading standards and proceed to formal discovery" in FCA cases. Vassallo, 2017 WL 4570706, at *5, n.5 (citations omitted). And, it reflects that "allowing a *qui tam* relator to amend his or her complaint after conducting further discovery would mean that 'the government will have been compelled to decide whether or not to intervene absent complete information about the relator's cause of action.'" Karvelas, 360 F.3d at 221. None of those concerns are present here.

For all of the foregoing reasons, Defendants Motion to Strike (Doc. No. 135) will be denied.

## B. Corporate and Individual Defendants' Motions to Dismiss

### 1. Standard of Review

In considering a motion to dismiss under Rule 12(b)(6), the Court "construe[s] the complaint in the light most favorable to the plaintiff, accept[s] its allegations as true, and draw[s] all reasonable inferences in favor of the plaintiff." Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007). From the Complaint, the Court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002). That is, the allegations "must be enough to raise a right to relief above the speculative level," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Iqbal, 556 U.S. at 678-79.

Additionally, "[c]omplaints alleging [FCA] violations must comply with Rule 9(b)'s requirement that fraud be pled with particularity[.]" Chesbrough v. VPA, P.C., 655 F.3d 461, 466

13

(6th Cir. 2011). "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide [] examples of specific' fraudulent conduct that are 'representative samples.'" United States *ex rel*. Marlar v. BWXT Y-12, L.L.C., 525 F.3d 439, 444–45 (6th Cir. 2008) "In alleging fraud or mistake [under that Rule], a party must state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Despite the heightened pleading standard, "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8," which "requires only 'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.'" United States *ex rel*. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493, 503 (6th Cir. 2007) (quoting Fed. R. Civ. P. 8(a)). In other words, "the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." Id.

### 2. Application of Standards to the Motions to Dismiss

The SEES Defendants move to dismiss on four primary grounds. First, they claim that Plaintiffs fail to plead an underlying violation under any of their three theories of liability. Second, they argue Plaintiff have failed to sufficiently plead the scienter required to establish a predicate violation of the Anti-Kickback Statute, and more particularly that Defendants "knowingly and willfully" paid remuneration to induce referrals. Third, they argue that Plaintiffs fail to plead the particulars of a false claim to the government as required by Rule 9(b). Finally, the SEES Defendants argue that Plaintiffs' claims are barred by the FCA's public disclosure bar.

14

For their part, and in direct contravention of the undersigned's stated preference that "[c]ounsel should never incorporate legal authority or factual argument from another document, including a prior brief or the brief of another party in the case,"[4] the individual Defendants (Bierly and Mann) "adopt and incorporate by reference the SEES Defendants' Memorandum of Law in Support of Motion to Dismiss Relators' First Amended Complaint." (Doc. No. 139 at 5). They go on to "emphasize" two points: (1) Plaintiffs fail to plead a plausible predicate of the Anti-Kickback Statute as to them because they do not sufficiently allege that either individual acted with the purpose of induce referrals, nor have Plaintiffs sufficiently alleged that either knew their conduct was unlawful; and (2) Plaintiffs have not met the particularity requirement of Rule 9(b) as to them because they fail to particularly allege Drs. Mann or Bierly presented a claim to the Government or made a false record or statement material to the claim or record.

Because of the substantial overlap of the arguments, the Court considers the motions to dismiss together. The Court begins, however, with a very brief overview of the Anti-Kickback Statue and the FCA in an effort to place Defendants' arguments into context.

### A. The FCA and the Anti-Kickback Statute – Generally

The FCA imposes liability on any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1). "[A] claim under § 3729(a)(1)(A) "requires proof that the alleged false or fraudulent claim was 'presented' to the government." United States ex rel. Marlar v. BWXT Y-12, LLC, 525 F.3d 439, 445 (6th Cir. 2008).

---

[4] See www.tnmd.uscourts.gov/sites/tnmd/files/Judicial%20Preferences%2020200420.pdf.

In most cases, the false claim is alleged to be "factually false" because it misstates or misrepresents the amount or quality of goods or services. A claim can also be "legally false," however, and this occurs "when the claimant lies about its compliance with a statutory, regulatory, or contractual requirement." United States ex rel. Greenfield v. Medco Health Sols., Inc., 880 F.3d 89, 94 (3d Cir. 2018).

Claims alleging a violation of the Anti-Kickback Statute fall into the "legally false" category of falsity because the statute makes it unlawful for anyone to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C.A. § 1320a-7b(A). The Anti-Kickback Statute also provides "a claim that includes items and services resulting from a violation of [that Statute] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). In other words, it is "illegal to pay someone to induce them to refer a patient for services that will be paid for by a federal healthcare program," Stop Illinois Health Care Fraud, LLC v. Sayeed, 957 F.3d 743, 745 (7th Cir. 2020), and hence,"[a] violation of the Anti-Kickback Statute . . . automatically constitutes a false claim under the False Claims Act," United States v. Mallory, 988 F.3d 730, 741 (4th Cir. 2021).

Establishing an Anti-Kickback claim requires proof that defendant (1) knowingly and wilfully, (2) offered or paid remuneration, (3) to induce another to refer a patient for services, (4) that was to be paid for by Medicare. 42 U.S.C. § 1320a–7b(b)(2)(A); United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 698 (11th Cir. 2014). Defendants insists that

16

Plaintiffs cannot establish these elements for a number of reasons.

### B. *Predicate Violations and Plaintiffs' Three Theories of Liability*

Defendants' first argument is that Plaintiffs' co-management kickback theory "fails for the simple reason that co-management is a *legal* practice approved by CMS [Centers for Medicare and Medicaid Services]." (Doc. No. at 133 at 14) (emphasis in original). Defendants are undoubtedly correct that the CMS allows for co-managed care in the sense that global surgery packages covering surgery and aftercare are permissible. Indeed, the provision cited by Defendants (CMS Publication O. 100-04, Chapter 12) sets forth the procedure codes and the modifiers to be used for billing Medicare or Medicaid, depending upon whether the physician furnishes the entire global surgery package, or others are involved in postoperative care. This is a far cry from endorsing all forms of co-management, however, let alone one that offers improper inducements to others to share in the fees as alleged in the Amended Complaint.

Next, Defendants argue that they provide no prohibited remuneration to optometrists because they are simply provided the *opportunity* to earn a co-management fee. (Id.). Unfortunately for Defendants, that argument has been rejected in the past, even if that rejection began with what Defendants downplay as "an out-of-circuit case, more than a quarter century old, that had nothing to do with co-management." (Doc. No. 133 at 9).

In <u>United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.</u>, the First Circuit observed that "[t]he gravamen of Medicare Fraud is inducement," and "[g]iving a person an *opportunity* to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient." 874 F.2d 20, 29 (1st Cir. 1989) (emphasis added). In arriving at that conclusion, the First Circuit was "impressed by the Third Circuit's reasoning" that,

17

"[b]y including such items as kickbacks and bribes, the statute expands 'remuneration' to cover situations where no service is performed," and "[t]hat a particular payment was a remuneration . . . rather than a kickback, does not foreclose the possibility that a violation nevertheless could exist." Id. (citing United States v. Greber, 760 F.2d 68, 71 (3d Cir.1985). In the twenty-five years since the decision was issued, Bay State's logic has since been followed by numerous courts. See, e.g., United States v. Palin, No. 1:14CR00023, 2016 WL 5941930, at *13 (W.D. Va. Apr. 7, 2016) (stating that "the words 'to induce' require 'an intent to exercise influence over the reason or judgment of another in an effort to cause the referral of program-related business" and quoting Bay State's "opportunity" language); United States ex rel. Pogue v. Diabetes Treatment Centers of Am., 565 F. Supp. 2d 153, 162 (D.D.C. 2008) (also quoting Bay State's "opportunity" language and stating that "[i]nducement serves a central role in assessing claims of Medicare fraud"); Zimmer, Inc. v. Nu Tech Med., Inc., 54 F. Supp. 2d 850, 863 (N.D. Ind. 1999) (relying on Bay State in concluding that an agreement in which an independent contractor received a percentage of sales in exchange for distributing products was unlawful under Anti-Kickback Statue).

Besides, Plaintiffs' allegations, which must be accepted as true for present purposes, are that Defendants provided much more than an opportunity – they actually induced optometrists through unlawful remuneration to funnel its cataract patients to SEES for surgery. Given that almost a third of SEES' cataract surgeries are not co-managed suggests that Plaintiffs may overstate that SEES co-management is "automatic," "routine," or "blanket," does not alter this conclusion. "Intent is all that is required, it does not matter whether 'a particular referral results.'" United States v. Teva Pharms. USA, Inc., No. 13 CIV. 3702 (CM), 2019 WL 1245656, at *10 (S.D.N.Y. Feb. 27, 2019) (citing United States ex rel. Parikh v. Citizens Med. Ctr., 977 F. Supp. 2d 654, 665 (S.D. Tex. 2013)).

18

"Thus, the statute does not require evidence of a 'quid pro quo' in the sense that each bribe must successfully generate referrals." Id. (citing United States ex rel. Kester v. Novartis Pharm. Corp., 23 F. Supp. 3d 242, 263 (S.D.N.Y. 2014)).

Moreover, and contrary to Defendants' efforts to limit its scope, the term "remuneration" for purposes of the Anti-Kickback Statue is broadly defined. Also, contrary to Defendants' arguments, the Complaint clearly alleges facts supporting the inference that each of the types of "remuneration" alleged in this case was unlawful because it was used as an improper inducement for referrals.

"The statute defines 'remuneration' as 'transfers of items or services for free or for other than fair market value.'" Jones-McNamara v. Holzer Health Sys., 630 F. App'x 394, 401 (6th Cir. 2015) (citation omitted). "'Congress's intent in placing the term remuneration in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.'" United States v. Blair, No. CR ELH-19-00410, 2021 WL 4339132, at *16 (D. Md. Sept. 23, 2021) (quoting Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35,958 (July 29, 1991). Thus, "[a]t its basic level, the statute clearly forbids receiving money or goods, in any way, in exchange for referrals." United States v. Williams, 218 F. Supp. 3d 730, 740 (N.D. Ill. 2016).

"An important aspect of inducement is that the remuneration be directed towards an individual or entity 'in a position to generate Federal health care program business.'" Jones-McNamara, 630 F. App'x at 401 (citation omitted). On this point, the "Third, Fifth, Ninth, [Seventh], and Tenth Circuits" are in accord that "[n]othing in the Medicare fraud statute implies that only the primary motivation of remuneration is to be considered"; rather, "if part of the payment compensated past referrals or induced future referrals, that portion of the payment violates" the

19

statute. United States v. Borrasi, 639 F.3d 774, 782 (7th Cir. 2011) (collecting cases); see also

Dhaliwal v. Salix Pharms., Ltd., 752 F. App'x 99, 100 (2d Cir. 2019) (noting that the Anti-Kickback

Statute "forbids providing 'anything of value in any form whatsoever'" and stating that a violation

occurs "if at least 'one purpose' of [the] remuneration" is in return for a referral).

That is precisely what is alleged here. In exchange for a package of goodies including the

80/20 percent fee split, optometrists are lured into sending their patients to Defendants' eye surgeons.

This conclusion remains, even if the Court separately considers the two remaining types of

remuneration as argued by Defendants.

Plaintiffs have stated a plausible violation of the Anti-Kickback Statute in relation to the

additional moneys paid to optometrists for their patients who chose premium lenses, notwithstanding

Defendants contention that the follow-up eye exams need to be more thorough when the lens

includes a corrective prescription. Certainly, the Court has no basis for concluding at the motion to

dismiss phase that an additional $150 or $300 is fair market value for the additional services

rendered, whatever those may be. Nor is the Court in a position to say that the practice described

in the Amended Complaint falls within the purview of OIG Advisory Opinion No. 11-14, as

Defendants contend. That Advisory Opinion of the Inspector General was specifically "limited to

the facts presented," and was not to "be relied on by any persons other than [name redacted], the

requestor of this opinion." (Doc. No. 134-1 at 1, 2). Moreover, the "facts" there appear to be

different from those alleged in the Amended Complaint, including that (1) the surgical group "d[id]

not have any written or unwritten agreements with optometrists regarding co-management"; (2)

patients receiving premium lenses were notified that "their optometrists may charge additional fees

for the post operative services that the patients would not incur if the [surgeon] furnished the care";

and (3) the surgical group "also certified that it would transfer a patient back to his or her optometrist only upon the patient's request." (Id. at 4, 6). Here, in contrast, the Amended Complaint alleges a blanket arrangement where transfers were prearranged without patient's acquiescence, and patient's were not informed about the premium lens fees paid to their optometrists. (Doc. No. 123, Amended Complaint ("Am. Compl.") ¶¶ 15, 84, 87, 99-104).

Plaintiff have also stated a plausible violation of the Anti-Kickback Statute in relation to free (later discounted) continuing education, dinners, golf tournaments, and ball games. Notwithstanding that these things fall into the "classic kickback" category, Defendants argue the Amended Complaint is insufficient because it does not allege that "any particular seminar was offered to referring optometrists at below fair-market-value-rates" or that the other offerings were more than *de minimus* shows of appreciation. (Doc. No. 133 at 22).

The problem with Defendants' arguments is that they ignore the allegations in the Amended Complaint. Take, for instance, the seminars. The Amended Complaint alleges that professional certification seminars for optometrists typically cost $25 to $50 per credit, yet they were offered for free by the SEES Defendants until 2017 and thereafter for a "nominal fee." (Doc. No. 123, Am. Compl. ¶¶ 144, 146). The Amended Complaint also alleges that SEES offered 2 or more credit seminars, along with free dinners and an open bar, the value of which exceeded $100 per event, per person. As for the free dinners for high referrers, the Amended Complaint alleges that "they were held at expensive restaurants, including Ruth's Chris, Bistro by the Tracks, St. John's Restaurant, and Del Friscos, with a budget of $1,500 per dinner." (Id. ¶ 1155). Finally, in regard to the golf tournaments, Plaintiffs allege that the average costs was between $7,200 and $7,700 and, "[w]ith an average of 25-30 players that would be at least $240 per person – per event – with no money being

21

charged to or paid by any of the optometrists attending the event."  (Id. ¶ 153).

In short, the allegations of the free perks in this case are far different from the allegation in cases like Jones-McNamara v. Holzer Health Sys., 630 F. App'x at 402, where a $24 jacket and free hotdogs and hamburgers at an annual healthcare and wellness event would not "induce a reasonable person to prefer one provider over another."  Instead, what is alleged here is  more than "'token' gestures of good will under OIG guidance."  Id. SEES may be truly altruistic towards its referring optometrists, but its nobility of purpose and spirit cannot run afoul of the Anti-Kickback Statue. Whether that has occurred remains to be seen.

### C. Fraudulent Intent to Induce Referrals

Defendants next argue that Plaintiffs fail to plausibly allege that SEES used co-management and other incentives with the intent to induce referrals.  More specifically, they argue that it is a common and legitimate practice for referral-based businesses to track referrals in order to better understand their clients and monitor and plan for growth , even if there was a collateral hope that this would result in referrals.   Because there exists an "obvious alternative explanation" for Plaintiffs' allegations, Defendants argue the Amended Complaint fails to state a claim.

In advancing this argument, Defendants rely on the Sixth Circuit's unpublished decision in Deom v. Walgreen Co., and its language that "if the facts alleged are consistent with both legal conduct and 'purposeful' conduct taken with improper motive, the existence of obvious alternative explanations simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made." 591 App'x 329 (6th Cir. 2014).  However, Defendants not only omit Deom's additional statement that "the plausibility of an inference depends on a host of considerations," they also ignore Deoms's reliance on the Sixth Circuit's published opinion in 16630 Southfield Ltd.

P'ship v. Flagstar Bank, F.S.B., 727 F.3d 502, 504 (6th Cir.2013) for both statements.  A cogent

explanation of 16630 Southfield and these interrelated concepts is as follows:

> [T]he Sixth Circuit has instructed lower courts to respect the difference between
> plausibility, on the one hand, and facts that merely happen to be "consistent with
> liability," on the other. [quoting 16630 Southfield at 505].  And the distinciton
> between the two can turn, at least in part, on the availability—and plausibility—of
> alternative explanations for the events that occurred. Id. . . .  This is especially true
> as it relates to pleading intent. The existence of an "obvious alternative
> explanation[,]" can help differentiate between facts merely "consistent with liability"
> and those sufficient to plausibly allege "discriminatory intent."  Id.  That is, an
> obvious alternative explanation can help "illustrate[] the unreasonableness of the
> inference sought and the implausibility of the claims made."  Id.

> That by no means suggests that all a defendant must do to secure dismissal is point
> to a potential alternative explanation. To the contrary, the Sixth Circuit has observed
> that "the mere existence of more likely alternative explanations does not
> automatically entitle a defendant to dismissal."  Id. (citing Watson Carpet & Floor
> Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 458 (6th Cir. 2011)).  "Often,
> defendants' conduct has several plausible explanations. Ferreting out the most likely
> reason for the defendants' action is not appropriate at the pleading stage." Watson
> Carpet, 648 F.3d at 458.

Schobert v. CSX Transportation Inc., 504 F. Supp. 3d 753, 777–78 (S.D. Ohio 2020).  In other

words, "the impact of an alternative explanation in assessing plausibility appears to turn, to a large

extent, on how much more likely the competing explanation is than the plaintiff's explanation."  Id.

at 778.

In this case, the Court need not engage in a detailed weighing of the competing explanations

because the evidentiary value of an alternative explanation means less in the context of an Anti-

Kickback Statue case.  As previously explained, the Circuits that have addressed the issue have

uniformly held that if at least one purpose of the remuneration is in return for a referral, then the

statute has been violated.  Hence, Plaintiffs need only forward plausible allegations that *a* purpose

of Defendants' scheme was to induce referrals, and Plaintiffs have certainly done so here.  Among

other things, Plaintiffs allege the SEES targeted its remunerations to optometrists who were high referrers, but dropped those who were not; told optometrists that SEES' goal was to keep as much revenue in the optometrists' practice as possible; developed a business model that added value and pushed revenue to primary care optometrists; considered the true customer to be the optometrist, not the patient; and promised optometrist monthly checks for premium lens cash payments that were then delivered in person. (Doc. No. 123, Am. Cmpt. ¶¶ 111-131, 80, 93, 110, 162-166).

This holds true for the individual Defendants as well, notwithstanding their efforts to downplay their alleged responsibility by pointing out that they are "only" mentioned in 43 of the 241 paragraphs of factual allegations in the Amended Complaint. (Doc. No. 139). Of course, the measure is substance not quantity, and there are sufficient allegations (some admittedly conclusory) against Drs. Mann and Bierly for them to remain as Defendants at this time. These include, but are not limited to, the following:

> • Mann and Bierly are the co-founders, partial owners, and officers of SEES who have each been directly and personally involved in the implementing, managing, and marketing of SEEs' co-management model, knowing that it violated the Anti-Kickback Statute. (Doc. No. 123, Am. Compl. ¶¶ 17, 78).
>
> • Since at least 2012, SEES has been under the direction and control of Drs. Mann and Bierly, who submitted, or caused to be submitted claims to the Medicare and TennCare programs that were in violation of the Anti-Kickback Statute. (Id. ¶ 18). Even after SEES was acquired by FlexPoint Ford (an investment company) in 2017, Drs. Mann and Bierly continued to manage and were responsible for the day-to-day operations of SEES. (Id. ¶ 29)
>
> • Drs. Mann and Bierly have an equity stake in the surgery centers, and Dr. Mann is responsible for staffing the surgery centers. (Id. ¶ 30).
>
> • Both Defendants marketed their co-management model to optometrists by telling them their goal was to keep as much revenue in the optometrists' practices as possible. Indeed at seminars, Drs. Bierly and Mann stated that they could help grow the optometrists' practices and went so far as to offer training to those who were not

doing post-operative care.  (Id. ¶¶ 93, 94, 96).

• At a seminar in Nashville in 2016, Dr. Mann noted co-management requires patient consent, but urged that patients coming to SEEs' surgery centers should already expect to be co-managed.  He also suggested to those optometrists that they tell their patients that he or see would be seeing the patient after surgery because of insurance.  This would also stave off questions from patients as to why the surgeon was not doing the post-operative follow-up, particularly if the patient in question had only seen the optometrist once before the surgery.  (Id. ¶ 100).  Dr. Mann even offered "some coaching" to optometrists on how to direct patients as to where they should go.  (Id. ¶ 102).

• Dr. Mann personally delivered checks to high referring optometrists so as to "guarantee face time" with them.  (Id. ¶ 37).

• Both Defendants have described their "true customers" as being the referring optometrists, not the patient (Id. ¶¶ 109-110).  Indeed, Dr. Mann once stated that SEEs "would never throw [referring optometrists] under a bus for missing a diagnosis."  (Id. ¶ 114).

• Drs. Bierly and Mann both looked to lists of high referrers for premium lenses when choosing which optometrists to invite to roundtable discussions at fancy restaurants.  (Id. ¶ 178).

• Both Defendants were members of professional societies wherein it was widely publicized and known that routine cataract co-management agreements was likely unlawful.  (Id. ¶ 204).

• Both Defendants received and discussed an email sent by an optometrist expressing his concern that the free dinners, golf outings, and dinners violated the anti-kickback laws.  It was only afterwards that SEEs changed its practice somewhat by establishing a foundation to provide the educational seminars, and a nominal fee for attendance was imposed. (Id. ¶¶ 211-215).

In short, the Amended Complaint contains plausible allegations that Drs. Mann and Bierly orchestrated, implemented, and profited from a scheme whereby optometrists received kickbacks to refer patients to SEES surgery centers for cataract surgery.

### D. Knowingly and Willfully

Both the FCA and the Anti-Kickback Statute have knowledge or scienter requirements.  For

liability to attach under the FCA, a person or entity "knowingly present or cause to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1), with "knowingly" defined as meaning "actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity." Id. § 3729(b)(1)(A). For liability to attach under the Anti-Kickback Statute, a defendant must act both "knowingly" and "willfully." Id. § 1320a-7b(b). Generally, the term "willfully" means that the act is done with a "bad purpose," or some knowledge that the conduct is unlawful. Bryan v. United States, 524 U.S. 184, 191 (1998).

Defendants argue that there are insufficient allegations to show that they knew their co-management model was unlawful. After all, and to the contrary, the Amended Complaint alleges that Defendants knew about the relevant guidelines for co-managing care. It would make no sense for Defendants to publicize that they co-managed patients if they did so in an unlawful way. They even go so far as to argue that "Defendants who reasonably believe that a transaction was at fair market value for legitimate services cannot be found to have 'willfully' violated the law." (Doc. No. 132 at 3).

Of course, at the motion to dismiss stage, the court has no way of knowing whether the optometrists provided their aftercare services at fair market value, even leaving aside that the Amended Complaint alleges classic kick-backs in the form of free dinners, golf outings, seminars, and the like. Regardless, Defendants' arguments regarding knowledge clearly fail at this stage of the proceedings for two reasons.

First, the Anti-Kickback Statute itself provides that actual knowledge of the statute or the specific intent to violate it is not required. On this point, the statute could not be clearer: "With respect to violations of this section [anti-kickback], a person need not have actual knowledge of this

26

section or specific intent to commit a violation of this section." 42 U.S.C. § 1320a-7b(h); see United States v. Starks, 157 F.3d 833, 838 (11th Cir. 1998) (observing that the Anti-Kickback Statute "is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct," and that "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal"); United States v. Patel, 17 F. Supp. 3d 814, 824 (N.D. Ill. 2014) (stating that "the Anti–Kickback Statute is not a complex or technical one").

Second, and as already noted, Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," but "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). Thus, a "[r]elator is not required to state with particularity Defendant's intent to defraud; he is only required to state with particularity the circumstances (i.e., the time, place, and substance) surrounding the fraudulent activity." U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 642 (6th Cir. 2003). In other words, "pleadings regarding the conditions of a person's mind" are simply "bound[ed] by the plausibility requirement of Rule 8," id., meaning that plaintiff need only "plead facts about the defendant's mental state, which, accepted as true, make the state-of-mind allegation 'plausible on its face'" Republic Bank & Tr. Co. v. Bear Stearns & Co., 683 F.3d 239, 247 (6th Cir. 2012) (citation omitted).

Here, Plaintiffs more than adequately allege a culpable state of mind as to all Defendants. Not only do Plaintiffs allege that the prohibition against routine cataract co-management agreements was widespread and extensively disseminated by professional societies (of which Drs. Mann and Bierly were members) and in professional journals (that Drs. Mann and Bierly received), they also

27

allege purposeful concealment of unlawful conduct by Defendants. This included: directing a scheduler not to put blanket referrals in writing; declining an employee's suggestion that the amount paid to optometrist for premium lenses to referring optometrists be publicized because SEES needed to be cautious about breaking the law; refusing to do anything for two years after being informed that the free golf, dinners, and seminars were likely unlawful, but then changing course and charging a nominal fee for seminars; stating that the reasons for the newly-enacted nominal fee could not be put in writing; and acknowledging that the new seminar fees were below costs, but they needed to be imposed because of potential anti-kickback concerns. (Doc. No. 123, Am. Compl. ¶¶ 145-148, 208-212). See, United States v. Smith, 749 F.3d 465, 478 (6th Cir. 2014) (observing, among other things, that "intent can be inferred from efforts to conceal the unlawful activity [and] from misrepresentations").

### E. Rule 9(b) and Claims Submitted to the Government

Next, all Defendants argue that Plaintiffs fail to comply with Rule 9(b) because they do not allege a specific false claim to the Government. The individual Defendants double down on the argument by asserting that the First Amended Complaint "does not identify a single, particular optometrist to whom *Drs. Mann or Bierly* paid an allege kickback, nor a single claim for payment that has a particular connection to *Dr. Mann or Bierly*." (Doc. No. 164 at 5) (emphasis in original). Defendants ask too much at the pleading stage, even under the Sixth Circuit's "'strict requirement that relators identify actual false claims." U.S. *ex rel.* Eberhard v. Physicians Choice Lab'y Servs., LLC, 642 F. App'x 547, 550 (6th Cir. 2016).

Unlike several other circuits that require only the likelihood of submission, the Sixth Circuit has held that where, as here, a plaintiff alleges a "'complex and far-reaching fraudulent scheme,' in

28

violation of § 3729(a)(1)," he or she must "identify a representative false claim that was actually submitted to the government." <u>Chesbrough v. VPA, P.C.</u>, 655 F.3d 461, 470 (6th Cir. 2011). "Although the relator does not need to identify every false claim submitted for payment, he must identify with specificity 'characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme.'" <u>Id.</u> (quoting <u>U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.</u>, 501 F.3d 493, 510 (6th Cir. 2007)). Plaintiffs have met the Sixth Circuit's "strict requirements."

The First Amended Complaint identifies twenty claims submitted to – and paid by – Medicare. Those twenty claims represent two bills for each of ten optometrists who referred most, if not all, of their patients to SEEs for cataract surgery. For each optometrist, the First Amended Complaint sets forth the alleged inducement he received. Most of those optometrists have been members of one of SEEs' advisory boards, several have been identified as top-referrers by SEEs, and all received assorted freebies, allegedly to induce them to refer patients to SEEs' surgery centers. (Doc. No. 123, Am. Compl. ¶¶ 174-185).

This conclusion applies even as to Drs. Mann and Bierly, notwithstanding their protest that they have not been shown to have been responsible for the submission of any bills, let alone those contained in the representative sample. "The prohibition on group pleading under Rule 9(b) prevents a plaintiff from simply lumping multiple defendants together without explaining each defendant's culpable role." <u>United State ex rel. Goodman v. Arriva Med., LLC</u>, No. 3:13-CV-0760, 2020 WL 1433861, at *7 (M.D. Tenn. Mar. 24, 2020). "Once the defendants' respective actions are set forth, however, there is nothing inherently wrong with using the same set of examples to support the allegations against each defendant." <u>Id.</u> The "respective actions" here are that Drs. Mann and Bierly implemented and orchestrated the scheme that allegedly violates the Anti-Kickback statute.

29

Furthermore, the FCA imposes liability on any person who "knowingly presents, or *causes* to be presented, a false or fraudulent claim for payment or approval[.]" 31 U.S.C.A. § 3729 (emphasis added). Thus, a complaint is adequate where it alleges that the defendants set company policy and implemented the "financial incentives designed to induce the submission of false claims." United States v. Anesthesia Servs. Assocs., PLLC, No. 3:16-CV-0549, 2019 WL 7372510, at *18 (M.D. Tenn. Dec. 31, 2019); see also United States *ex rel.* Kuzma v. N. Arizona Healthcare Corp., No. CV18-8041-PCT-DGC, 2021 WL 120901, at *5 (D. Ariz. Jan. 13, 2021) ("[T]he FCA holds a defendant liable if it pursues a scheme that ultimately results in the submission of a false claim, even if the defendant does not participate in the actual submission of the claim."); United States *ex rel*. Fesenmaier v. Cameron-Ehlen Grp., Inc., No. 13-CV-3003, 2021 WL 101193, at *12 (D. Minn. Jan. 12, 2021) (citation omitted) (stating that "a defendant's conduct may be found to have caused the submission of a claim for Medicare reimbursement if the conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct").

### F. Public Disclosure Bar and Original Source

Defendants' final argument requires little discussion. They assert that Plaintiffs' claims are barred by the public disclosure bar because at least three disclosures before Plaintiffs filed their Complaint revealed the same allegations of wrongdoing.[5] In other words, Plaintiffs' are not the

---

[5] This includes "(1) a February 27, 2017 press release describing SEES' 'co-management model'; (2) a December 2015 SEES newsletter that described fees payable to optometrists for providing post-operative care; and (3) a SEES calendar of CME events, which included descriptions and prices." (Doc. No. 133 at 25) (internal parentheticals and footnotes omitted).

"original source" of the allegations as required by the FCA.

"[T]o strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits,' . . . Congress added the public disclosure bar to withdraw jurisdiction over, among other things, suits based on information that had been previously disclosed unless 'the person bringing the action is an original source of the information.'" U.S. *ex rel.* Schumann v. Astrazeneca Pharms. L.P., 769 F.3d 837, 840 (3d Cir. 2014) (citing 31 U.S.C. § 31 U.S.C. § 3730(e)(4)(A)). However, "Congress amended aspects of the public-disclosure bar on March 23, 2010," United States *ex rel.* Holloway v. Heartland Hospice, Inc., 960 F.3d 836, 843 (6th Cir. 2020), by requiring a court to dismiss an FCA complaint that is based upon publicly disclosed information, except when that dismissal is "opposed by the Government," 31 U.S.C. § 3730(e)(4)(A). The amendment is not retroactive. Graham Cnty. Soil & Water Conservation Dist. v. United States *ex rel.* Wilson, 130 S.Ct. 1396, 1400 n.1 (2010).

In this case, both the United States and the State of Tennessee oppose dismissal. (Doc. Nos. 71, 156). Nevertheless, Defendants insist dismissal is warranted because the allegations in the Amended Complaint date back to the beginning of 2010. In an effort to resolve the 81-day issue (January 1, 2010 to March 22, 2010), Plaintiffs, in their sur-reply brief,[6] "agree to limit the relevant period of liability to begin on March 23, 2010" and, if necessary, file an amended complaint so limiting the date. (Doc. No. 168-1). In response, Defendants cite several cases standing for the proposition that "a sur-reply is not the appropriate means for amending a complaint or voluntarily dismissing claims." (Doc. No. 170 at 4). Thus, Defendants insist that Plaintiffs either move to

---

[6] Defendants object to Plaintiffs' Motion for Leave to File a Sur-reply (Doc. No. 168) but in doing so argue the merits of Plaintiffs' statement that they would limit their claims to those arriving after March 22, 2010. Because the Court has considered both filings, Plaintiffs' motion for leave will be granted.

31

amend their complaint one again, or voluntarily dismiss any claims arising before March 23, 2010.

First among the Federal Rules of Civil Procedure is that "[t]hey should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. Furthermore, "Rule 41 does not speak to dismissal of claims, and an amendment pursuant to Rule 15 is the appropriate way to dispose of fewer than all claims against a defendant." Baker v. City of Detroit, 217 F. App'x 491, 496 (6th Cir. 2007). Although Defendants are correct that "[a] request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend," Louisiana Sch. Employees' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 486 (6th Cir. 2010), Plaintiffs do more than mention an aside. They specifically state that their intention would be to amend the complaint to simply narrow the time frame by 81 days. It would be a hyper-technical formality for the Court to require Plaintiffs to formally move to amend given counsels' representations. Instead, Plaintiffs will be provided a brief window of time within which to specifically and formally narrow their claims as beginning on March 23, 2010.

## III. CONCLUSION

In addition to eyes being the windows to one's soul, it has been said that one can be bitten by the green-eyed monster. Whether Plaintiffs as competitors are jealous of Defendants and the business model they have developed is not an issue for the Court to decide. Even so, this is hardly the typical FCA case because Plaintiffs do not allege that the federal fisc is out even one thin dime as a result of Defendants' alleged kickback scheme. That partially explains the almost 175 pages

of briefing, including almost 130 pages on the Motions to Dismiss alone.[7]  However, and as already noted, the FCA through the Anti-Kickback Statute prohibits legally false claims, *i.e.* that the claimant complied with statutory, regulatory, or contractual requirement when it did not.

The Court's present task is to simply decide whether Plaintiffs have stated a plausible FCA claim and whether that plausible claim has been stated with the particularity required by Rule 9(b), not whether Plaintiffs can ultimately prove their case or even prevail on summary judgment. Because Plaintiffs have adequately pleaded a case as to all Defendants, the Motions to Dismiss will be denied.  The Motion to Strike will also be denied because Defendants have not established that Plaintiffs improperly used the CID material they received from the United States.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[7] The length of the briefing is also explained by the significant overlap within and between the briefs that have been filed.  Suffice it to say, the Court has thoroughly considered each and every argument raised by Defendants.  For this reason, the Court is unlikely to entertain any motions to reconsider, particularly one that asserts the Court failed to consider a specific argument in relation to a specific claim.